HURT, J., dissents upon the ground that the Legislature had no authority to pass Article 454, Penal Code.

Opinion delivered November 22, 1882.

---

[No. 1421.]

PINK HARRIS v. THE STATE.

1. THEFT—EVIDENCE.—See evidence in this case *held* insufficient to sustain a conviction for theft.
2. SAME—CHARGE OF THE COURT ON CIRCUMSTANTIAL EVIDENCE.—When the inculpatory evidence is purely circumstantial, it is incumbent on the trial court to instruct the jury as to the law applicable to such proof.

APPEAL from the District Court of Freestone. Tried below before the Hon. L. D. Bradley.

The indictment charged the appellant and Jeff Dunn jointly

with the theft of nineteen head of cattle, the property of Jesse Awalt, in Freestone county, Texas, on the twenty-fifth day of August, 1881. The appellant being alone upon trial was convicted, and his punishment assessed at two and a half years in the penitentiary.

Jesse Awalt was first introduced by the State, and testified that he had resided on Caney creek, at the edge of Awalt prairie, in Freestone county, for thirty years, and owned a small stock of twenty-five or thirty head of cattle ranging in that neighborhood. The witness had no recorded mark or brand in August, 1881, but his stock was marked with an under half-crop in the right ear, and a swallow-fork in the left; which was the witness's unrecorded mark. None of his stock was branded. The witness has since had his mark recorded.

In August, 1881, the witness missed nineteen head of his stock, and searched for them several days without success. These nineteen were unbranded, but marked, and were worth ten dollars per head. The witness could not name their flesh marks accurately, but for the most part they were yellow cattle. One was a red cow with dark stripes, and two might be called spotted. The cattle missing included five cows, nine two-year-olds and five yearlings. The range of these cattle was around the witness's place and within a radius of two miles. The witness last saw these nineteen head of cattle on the tenth or eleventh of August, 1881.

A certain steer, the property of Washington Speed, marked and branded in Speed's mark and brand, habitually ranged with this bunch of the witness's cattle, and was with the bunch on the tenth or eleventh of August, when last seen. After that time, but in the same month, Speed came to the witness's house, looking for the steer, and he and the witness together made unsuccessful search for the missing animals. The witness made inquiry for his stock, but could find no one who had seen them since he had. These cattle were gentle, and came to the house regularly. The most direct route to the Bonner and Lamb bridge across Tehuacana creek was well settled, but the witness could find no one who had seen any one driving these cattle on that route.

The witness finally learned that a drove of cattle had been driven to Corsicana from Freestone county about the time that his stock disappeared, and he went to Corsicana to inquire about them. He called on Mr. F. L. Smithy, the cattle inspector, and

with him made an examination of that officer's records. These records disclosed that on the thirteenth day of August, 1881, one James Anderson had shipped from Corsicana nineteen head of cattle, corresponding in number and mark with the animals which the witness had lost. The records disclosed also that Anderson shipped with the same bunch one steer, which in mark and brand corresponded exactly with Speed's steer. These cattle were not driven off with the consent of the witness.

F. L. Smithy, for the State, testified that he was cattle inspector at Corsicana in August, 1881. On the thirteenth day of that month, Jim Anderson and another young man, who was a stranger to the witness, came to the witness in Corsicana to get him to inspect a lot of cattle which he, Anderson, wanted to ship. The herd numbered twenty-one head of mixed cattle, including nineteen unbranded head, marked with an under half-crop in the right and a swallow-fork in the left ear; and two cows, one branded W3, and marked with a crop and under half-crop in the left, and a swallow-fork in the right, which was the mark and brand described as being on Speed's steer. The other cow was branded DC, and marked with two underbits in each ear. Anderson had a bill of sale, which the witness, finding it to correspond with the marks and brands on the cattle, copied in his inspection book. Those cattle were shipped on the thirteenth day of August, 1881. Mr. Awalt came to the witness some two weeks afterwards to inspect his books and see if any of his cattle had been shipped by any one.

Washington Speed testified, for the State, to his ownership of a steer branded W 3, and marked with a crop and under half-crop in the left, and a swallow-fork in the right ear, which ran with Jesse Awalt's cattle, on Awalt's prairie. The animal disappeared in August, 1881, and had never been seen by the witness since. The witness had never authorized any one to take this animal.

F. M. Harris testified that he lived in Freestone county, four or five miles from the Bonner and Lamb bridge, on Tehuacana creek, three-quarters of a mile from Caney creek, and about two miles from Jesse Awalt's. On or about the tenth or eleventh day of August, 1881, Jim Anderson, Pink Harris and Jeff Dunn came to the witness's house from the direction of the Bonner and Lamb bridge. Anderson asked the witness if he knew of any one who had cattle to sell, and the witness replied that he did not. Anderson and his party then rode down the road towards

Caney creek. In about a half hour Pink Harris and Jeff Dunn returned to the witness's house and asked if the witness could furnish them dinner. The witness replied that he could, and they left, returning in about fifteen minutes with Anderson, and all three got dinner. Before leaving Anderson said: "Well, I don't believe you want to sell any cattle." The witness replied that he did not. This occurred about one or two o'clock in the evening. Anderson, Dunn and the defendant then rode off towards Caney creek, and the witness saw no more of them. He did not see them return. He did not see them pass with cattle. If they had passed his house the witness could have seen them. There were two roads leading from Caney creek to the Bonner and Lamb bridge on Tehuacana creek. The Awalt cattle ranged on Caney creek, and occasionally came as far from it as the witness's place. The witness was not related to the defendant. When the parties named came to the witness's house, one was riding a bay horse and the other two sorrels.

The cross-examination of this witness resulted in a reiteration of his testimony in chief, with the addition that Anderson did all of the talking about their business project. The witness had known Anderson for two or three years, and knew that he had been engaged in cattle dealing. He was in the witness's neighborhood about a year previous to this trial, inquiring for cattle, and, the witness thought, bought some cattle from the Vickers family on that occasion. The witness could not remember whether the defendant helped Anderson drive the Vickers cattle or not.

Walter Bonner testified, for the State, that, in August, 1881, and about the time that it was said that the Awalt cattle were missing, at a point in the lane just before the Bonner and Lamb bridge across Tehuacana creek is reached, he met and passed a herd of twenty or twenty-five head of cattle. At the same time and place he met and passed Jeff Dunn and another man whom the witness did not know. This road led from the bridge to Hero Dunn's place, where Peter Dunn was living at that time. When the witness first saw Jeff Dunn and his companion he thought that they were driving the cattle, but as he approached, Dunn and his companion rode along as though they were not driving the cattle, and the witness concluded that the cattle had been to the creek for water and were coming out.

The man who was with Dunn at that time resembled Jim Anderson somewhat, but the witness could not testify that he was

Anderson. That man, the witness thought, was about Anderson's size, but somewhat darker of complexion. The witness had never seen Anderson to know him until on this trial. The witness passed these cattle about half a mile north of Bonner and Lamb's bridge. When the witness reached the bridge he saw the defendant and another man whom he did not then know, but who he has since recognized as Mr. Harral. They were some seventy-five yards distant from the witness in the bottom south of the bridge, but were not going in the direction of the cattle. The witness did not know what they were doing or where they were going. Harral was then riding a bay horse, the defendant a bay or sorrel, and Jeff Dunn and his companion a bay or sorrel. There was one bay and two sorrel horses in the crowd. From the description of Anderson as he had heard it, the witness at the time took the man who was with Dunn as him, but could not so testify. This all occurred late in the evening.

On his cross-examination this witness stated that the defendant Harris and his companion were not driving cattle when he saw them. They were to the right, and on a different road than the one witness traveled after he left the bridge. The witness paid no particular attention to the cattle; did not notice their marks or brands, and did not know who owned them.

Josh Shelton testified, for the State, that he spent one night in August, 1881, with Bill Harris, a brother of the defendant, at the defendant's house. The witness slept with Bill Harris that night. The defendant was not at home when the witness and Bill Harris reached the house, but he came about nine or ten o'clock that night. On the next morning the defendant called Bill Harris, and the defendant and Bill Harris walked off towards the cow pen. They stopped about half way, and the witness heard the defendant say to his brother: "Bill, we penned the Awalt cattle at Peter Dunn's last night, and Jim Anderson told me to tell you that he wanted you to go over this morning, and help drive them to Corsicana." Bill Harris replied: "I don't want to have anything to do with those cattle; it is a ticklish business." The defendant said in reply: "You had better go. There is big money in it." The witness did not know whether or not Bill Harris went. Bill rode off about the time that the witness rode off.

On his cross-examination the witness said that he was not a witness and did not testify at the trial of Jim Anderson at the

last term of the court. He was brought to Fairfield, the week before this trial, as a witness before the grand jury, and was then attached as a witness in this case. The defendant remained at home on the morning when the witness left his house. He did not know whether the defendant left his house that day or not. He did not know whether or not Bill Harris went to Peter Dunn's that day, nor did he know whether or not he assisted Anderson with the cattle. There were no persons at Harris's house that night except the defendant, his wife, Bill Harris and the witness. The witness did not know where Mrs. Harris was when the conversation occurred between the defendant and Bill Harris, but she was somewhere about the premises.

Nothing was said that night at Harris's house by any one about Jim Anderson or the Awalt cattle. The horse lot and cow pen at Harris's were situated about seventy-five or a hundred yards from the house. The witness walked out to a point within ten or fifteen steps of where the defendant and Bill Harris were talking, and was standing there listening when he heard the conversation detailed. They did not notice the witness, and were talking in a rather low tone of voice. This was the only conversation in which the witness had ever heard the Awalt cattle mentioned. The witness did not know the Awalt cattle; nor did he, of his own knowledge, know anything of cattle being penned at Peter Dunn's by Jim Anderson, or anyone else. He knew Jim Anderson to be a cattle dealer, and he knew that the defendant and Jeff Dunn were in the habit of hiring to parties to drive cattle, but he did not know whether Anderson had the defendant employed at that time or not.

The defense inquired of the witness if, since the time referred to, he had not quarreled with the defendant, and if he did not entertain ill will and hatred towards this defendant. The witness replied: "The defendant and I had something of a difficulty at a dance about two years ago, but I have forgotten what it was about. He and I are and have been friendly since, and I do not bear malice against the defendant at this time."

John Cantalow testified, for the State, that in August, 1881, about the time that the Awalt cattle are said to have disappeared, he saw the defendant, Jim Anderson, Jeff Dunn, and a man whom he took to be Harral, together, near the Sam Lamb place, on Tehuacana creek, traveling north, on a road which led in the direction of the old Patton crossing of Caney creek. This was about ten o'clock in the morning. Harral was riding a gray

horse, and, to the best of the witness's recollection, the others were riding a bay and two sorrels.

Cross-examined, the witness said that the parties, when he saw them, were not driving cattle, and he did not know where they were going. Awalt prairie was six or seven miles due east from the point where the witness saw them. The witness was not driving with W. M. Wilder at the time. Wilder was not far off, and perhaps saw the party. Wilder and the witness met at the tank afterwards. The State closed.

F. L. Smithy was introduced by the defense, and was handed a bill of sale and asked if that was not the bill of sale shown him at the inspection pens by Anderson. The witness replied that he thought not. He was then asked if it was not the same bill of sale which was shown him on the trial of Jim Anderson at the last term of the court. The witness replied that he thought not. He was then asked if the bill of sale shown him on the trial of Jim Anderson was not the same that was shown him by Jim Anderson when the cattle were inspected. The witness replied that, to the best of his recollection, it was. This witness also testified, positively, that the young man who assisted Jim Anderson with the cattle at Corsicana was not the defendant. He did not know who that young man was.

B. H. Graham, county attorney, was next called to the stand by the defense, and testified that the bill of sale in evidence was the identical bill of sale used in evidence on the trial of Jim Anderson, and that it had undergone no change since that trial.

The witness Smithy, on his cross-examination, stated that the bill of sale shown him in Corsicana, by Anderson, was written with black ink, according to the best of his recollection. The bill of sale in evidence on this trial was written with an indellible pencil, 'and the writing was of a light purple color. He further stated that the nineteen head of cattle were marked with a swallow-fork in the left ear and an under half-crop in the right ear, which marks, according to the witness's recollection, were properly described in the bill of sale shown him by Anderson in Corsicana, whereas the bill of sale now in evidence had the marks on the ears reversed.

The bill of sale in evidence reads as follows:

"STATE OF TEXAS, COUNTY OF FREESTONE.

    "August the 12th, 1881.

    "Know all men by these presence, that I have this day bar-

gained and sold to D. J. Anderson twenty-two head of cattle, for one hundred and seventy-six dollars, paid in hand. Marks and brands as follows, to-wit." [Here follows description by marks and brands, including nineteen head with Awalt's proper mark, except that it substitutes the right for the left ear, and the left for the right.]

"The above title I warrant and defend.

"Sam Pryor.

"Witness: Jeff Dunn."

Peter Dunn, for the defense, testified that some time in August, 1881, he found Jim Anderson, Jeff Dunn and the defendant at his house with a herd of fifteen or twenty head of cattle. He paid no particular attention to the cattle, and did not notice for marks or brands. A few days before this, Jim Anderson found the defendant at the witness's house, and told the defendant that he, Anderson, wanted the defendant to go with him into the brush and assist him in driving up a bunch of cattle. The defendant agreed to go, and did go with Anderson. The defendant farms at times, and at others hires to drive cattle. The witness had often known him to drive for cattle men before, and knew that he had often been hired by Anderson, who was a general cattle dealer, to drive for him. The witness heard Anderson employ him on this occasion to go with him and drive some cattle, which Anderson then said were across the creek or in the brush. He heard Anderson agree to pay him a dollar and a half a day for his labor, and heard the defendant accept the terms, and saw him go off with Anderson. A few days after Jim Anderson had penned these cattle at the witness's house, a man calling himself Sam Pryor came to the witness's house and inquired for Jim Anderson, and said that he wanted to sell him some more cattle. The witness directed him where to find Anderson. He had never seen the man Pryor before or since.

This witness testified, on cross-examination, that he did not remember what kind of a horse the man Pryor was riding. The witness knew Harral, who, he forgot to state in his testimony in chief, came with Anderson, the defendant and Jeff Dunn when the cattle were penned. Harral rode a gray horse. The defendant went home on that night, after the cattle were penned. Harral, Jeff Dunn and Anderson remained over night, and next morning the three drove the cattle to Corsicana. The morning they left with the cattle, Jim Anderson said that they got the

cattle from Sam Pryor, across the creek in Freestone county. The witness was a brother to Jeff Dunn.

W. M. Wilder testified, for the defense, that about the first of August, 1881, Jim Anderson, who was a general cattle dealer, came to his house, where Jeff Dunn was then boarding, and told Jeff Dunn that he wanted to hire him to help him drive some cattle. Dunn told him that, as he had several negroes hired and at work, he did not know that he could hire out just at that time. Anderson pressed him, telling him that he had employed the defendant, but was compelled to have another hand; that he could not get anyone else, and was exceedingly anxious to hire him, Jeff Dunn. Dunn told him that he would give him an answer that night. These negotiations terminated in Dunn hiring to Jim Anderson to drive cattle, and he left home for that purpose on that evening. Anderson had hired Jeff Dunn and the defendant to drive and handle cattle for him on many occasions before.

Cross-examined, the witness testified that he was with John Cantalow on or about the first of August, 1881, near the old Sam Lamb place. Cantalow came up to the witness at a tank. He and Cantalow were out driving deer. Jim Anderson, Jeff Dunn and the defendant passed near by the witness, going east. The witness, not being positive, asked Cantalow who they were, and Cantalow said they were Jim Anderson, Jeff Dunn and the defendant. The witness could not remember that Cantalow then said that Harral was with them, but he afterwards said so. Jeff Dunn married a step-daughter of the witness.

George Bradley testified, for the State, in rebuttal, that he had lived within two miles of Jesse Awalt for thirty years. No such man as Sam Pryor lived, or ever had lived in that section of the country. The witness had never heard of such a man in that section, nor had he ever seen a man in that country who ever had. He could find no one who had ever heard of Pryor except through the parties charged with driving Awalt's cattle.

The motion for new trial assailed the evidence and the charge of the court, upon which the rulings of this court are based, and embodied an averment of surprise by the testimony of Josh Shelton, which, the motion set up, could be proved untrue upon another trial. Affidavits attacking the truth of Shelton's testimony were filed. Appeal was prosecuted upon the motion being overruled.

*O. C. Kirven* and *Robertson & Finlay*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

White, P. J. No evidence was adduced on the trial of this case directly connecting this appellant, either as principal or hired hand, with the taking, penning or driving Awalt's cattle— the cattle alleged in the indictment to have been stolen. He drove cattle as a hired hand of Anderson, and penned them in Peter Dunn's pen, and he was seen in proximity to a bunch of cattle by other witnesses; but there is a signal failure on the part of the witnesses to identify in any manner these cattle, or any of them, as the Awalt cattle. Nor is the steer which ran with and was stolen at the same time identified by these witnesses as having ever been in possession of defendant. Does the evidence, then, support the verdict and judgment? We think clearly not. All the facts testified to may be true, and yet wholly inconsistent with defendant's guilty participation in the theft of the animals for the theft of which he was tried and convicted. Without the evidence connects him in some way with the property charged to have been stolen, we do not see how he can be held legally guilty of its theft.

Again, the evidence adduced in support of the theory of defendant's guilt was wholly and entirely circumstantial, and the court failed to charge the law with reference to that character of testimony. In cases resting wholly upon this species of evidence, charges upon the subject should always be given. (*Hunt* v. *The State*, 7 Texas Ct. App., 212; *Dreyer* v. *The State*, 11 Texas Ct. App., 631.)

Because both the evidence and the charge of the court are insufficient, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 24, 1882.